IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAVARY TREYMAYNE TRIGG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:10-cv-1962-B-BN |
| | § | |
| FREDDY WIGINTON, ET AL., | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the undersigned magistrate judge for pretrial management pursuant to 28 U.S.C. § 636(b) and an order of reference from the District Court. *See* Dkt. No. 92. The undersigned issues the following findings of fact, conclusions of law, and recommendation on Defendants' affirmative defenses of failure to exhaust administrative remedies.

**Background**

This is a civil rights case brought by a federal inmate under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). Plaintiff is a former inmate at FCI Seagoville in Seagoville, Texas.

Plaintiff alleges that Defendant Wiginton, a Lieutenant at FCI Seagoville, and Defendant Dean, a Senior Officer at FCI Seagoville, violated his constitutional rights when they used excessive force against him during a confrontation on December 2, 2009. Plaintiff seeks damages for injuries that he claims he suffered as a result of Defendants' use of excessive force; Plaintiff also seeks an award of attorneys' fees. *See*

Dkt. No. 65.

Defendants deny the excessive force allegations and raise the affirmative defenses of qualified or good-faith immunity and failure to exhaust administrative remedies. *See* Dkt. No. 66.

Defendants filed a motion for summary judgment in which they asserted that Plaintiff's claims are barred as a matter of law because he failed to exhaust his administrative remedies. *See* Dkt. No. 69. The undersigned recommended that the Court deny the motion because there are fact questions concerning Plaintiff's claims that prison officials thwarted his attempts to pursue his administrative remedies and that he exhausted all available administrative remedies. *See* Dkt. No. 81. Judge Boyle accepted the undersigned's Findings, Conclusions, and Recommendation and denied Defendants' Second Motion for Summary Judgment. *See* Dkt. No. 83.

Thereafter, on a reference from Judge Boyle, and consistent with the guidance in *Dillon v. Rogers*, 596 F.3d 260, 273 (5th Cir. 2010), the undersigned conducted an evidentiary hearing on the affirmative defense of failure to exhaust administrative remedies. *See* Dkt. Nos. 92, 93, 94 (Hearing Transcript), & 95 (Redacted Hearing Transcript).

The undersigned now concludes that Defendants have proved they are entitled to the affirmative defense of exhaustion of administrative remedies.

**Legal Standards**

The Prison Litigation Reform Act requires that an inmate exhaust all available administrative remedies before he may maintain a suit in federal court:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," including *Bivens* suits by federal prisoners. *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002).

"[T]he PLRA pre-filing exhaustion requirement is mandatory and non-discretionary." *Gonzalez v. Seal*, 702 F.3d 785, 787 (5th Cir. 2012). The United States Court of Appeals for the Fifth Circuit takes a "'strict' approach to the PLRA's exhaustion requirement," *Dillon*, 596 F.3d at 268, under which "[d]istrict courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint" and "have no discretion to waive the PLRA's pre-filing exhaustion requirement," *Gonzalez*, 702 F.3d at 788.

And the Supreme Court has refused to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). The pertinent inquiry is not whether the prisoner has pursued his administrative remedies reasonably and in good faith but whether he has exhausted all remedies that are available. *See Underwood v. Wilson*, 151 F.3d 292, 294 (5th Cir. 1998) (abrogated in part by *Jones v. Bock,* 549 U.S. 199, 214 (2007) (abrogating the holding in *Underwood* that a district court may dismiss a civil complaint *sua sponte* for failure to exhaust)).

3

The Code of Federal Regulations provides inmates a three-tiered administrative process for complaints related to any aspect of confinement. *See* 28 C.F.R. §§ 542.10-542.15. Prisoners have twenty days following the date of the event that is the basis for the request to file a formal Administrative Remedy Request (commonly known as a BP-9). *See id.* § 542.14. If a prisoner is not satisfied with the facility's warden's response to his request, he may file an appeal to the Regional Director (commonly known as a BP-10) within twenty days of the date on the response. *See id.* § 542.15. Prisoners may then appeal to the General Counsel within thirty days of the response from the Regional Director (commonly known as a BP-11). *See id.* The Code of Federal Regulations provides that, "[w]hen the inmate demonstrates a valid reason for delay, these time limits may be extended." *Id.*

The Fifth Circuit has recognized that there are circumstances in which administrative remedies may be personally unavailable to a particular prisoner and in which administrative remedies therefore will be deemed "unavailable" for purposes of Section 1997e(a). *See Days v. Johnson*, 322 F.3d 863, 867 (5th Cir. 2003), *overruled by implication on other grounds by Jones*, 549 U.S. at 216. As a general matter, where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they can render that remedy "unavailable" to such an extent that a court will excuse the prisoner's failure to exhaust. *See, e.g., Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). More specifically, "[i]f the institutional authorities refuse to provide a prisoner with the forms needed to exhaust administrative remedies, then those remedies are not 'available' to the prisoner," *Aceves v. Swanson*, 75 F. App'x

4

295, 296 (5th Cir. 2003); *accord Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004); *Abraham v. Costello*, 717 F. Supp. 2d 391, 395-96 (D. Del. 2010); *Davis v. Berkobile*, No. 3:07-cv-734-B, 2008 WL 2522502, at *8 (N.D. Tex. June 13, 2008), and "prison officials' statements concerning administrative remedies can render such remedies unavailable," *Dillon*, 596 F.3d at 268. Likewise, administrative remedies are "unavailable" where a prisoner is reasonably deterred from utilizing the grievance procedure by threats from prison officials. *See Turner v. Burnside*, 541 F.3d 1077, 1084-85 (11th Cir. 2008) (holding prison official's threat to transfer inmate away from his family may be sufficient to render administrative remedies unavailable).

A prisoner's failure to exhaust administrative remedies is an affirmative defense that Defendants must plead and prove. *See Jones*, 549 U.S. at 216. Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact. *See Dillon*, 596 F.3d at 266. While it is a question of law whether administrative remedies qualify as being "available" under 42 U.S.C. § 1997e(a), availability may sometimes turn on questions of fact. *See id.* "When the defendant raises exhaustion as an affirmative defense, the judge should usually resolve disputes concerning exhaustion prior to allowing the case to proceed to the merits. If the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary. Then, if the judge determines that the plaintiff has exhausted administrative remedies or that his or her failure to exhaust should be excused, the case may proceed to the merits." *Dillon*, 596 F.3d at 273 (footnote omitted).

**Evidentiary Hearing**

The undersigned conducted an evidentiary hearing on the affirmative defense of exhaustion of administrative remedies on June 27, 2013. *See* Dkt. No. 49 ("Tr.").

When Plaintiff arrived at FCI Seagoville, he was given a copy of the Admission and Orientation Booklet and participated in the Unit Admission and Orientation Program in which the administrative remedy process was explained. *See id.* at 14-18; *see also* Ex. 3 (Admissions & Orientation Information Handbook) at 91-92; Ex. 5 (Unit Admission and Orientation Checklist); Ex. 6 (Institution Admission and Orientation Checklist). Plaintiff testified that he was familiar with the administrative remedy process. *See* Tr. at 100-04.

The incident on which Plaintiff's excessive force claim is based occurred on December 2, 2009. After the incident, Plaintiff was confined in the Special Housing Unit ("SHU"), where he was confined 23 hours a day. *See id.* at 31, 104. While in the SHU, Plaintiff's access to forms was controlled. Typically, an inmate would obtain the forms from his counselor or, alternatively, from a unit manager or case manager, who would obtain them from a counselor. *See id.* at 32-33, 34, 72, 89-90, 102-03. Until shortly before this hearing in June 2013, both Plaintiff and Counselor Alex Guzman believed that Guzman was Plaintiff's counselor in December 2009 and January 2010. *See id.* at 27, 29, 35.

On December 2, 2009, after Plaintiff was taken to the SHU, he asked an officer for and was given a BP-8 form. *See id.* at 104, 110; Ex. 9 (Inmate Request to Staff). The BP-8 is the informal step in the administrative process. *See id.* at 101. Plaintiff also

6

handwrote an affidavit detailing the facts of the incident. *See id.* at 105-09; Ex. 16.

Plaintiff testified that, on December 3, 2009, he attempted to give the completed BP-8 to Counselor Guzman. *See* Tr. at 110-11. Counselor Guzman did not accept it and told Plaintiff that he would be transferred to another facility. *See id.* at 111. Plaintiff asked Counselor Guzman for a BP-9 form. *See id.* Plaintiff next saw Counselor Guzman in the SHU about a week later, and Plaintiff asked Counselor Guzman if Counselor Guzman had brought the BP-9 he requested. Counselor Guzman said no and again told Plaintiff that he would probably be transferred. *See id.* at 111-12, 125. Counselor Guzman never gave Plaintiff a BP-9 form. *See id.* at 115. Counselor Guzman testified that he does not recall Plaintiff asking him for a BP-9 form when Plaintiff was confined in the SHU and that he would have provided Plaintiff with a BP-9 form if Plaintiff had requested it, regardless of whether he was technically Plaintiff's counselor. *See id.* at 28, 137-38. Warden Cruz testified that the BP-9 was designed to allow inmates to alert prison officials about the existence of a complaint. *See id.* at 72-73. Plaintiff admitted that he never filed a BP-9. *See id.* at 125.

Plaintiff testified that he tried to talk to Warden Cruz and give her his handwritten affidavit when she was in the SHU on December 3 but that she just kept walking and said that she did not want to talk to him. *See id.* at 112, 116. Warden Cruz testified that it was her normal practice not to accept documents handed to her while she was on rounds and that, instead, she would instruct inmates to send the documents through the institutional mail. *See id.* at 140.

On December 4, 2009, Plaintiff made handwritten copies of his affidavit and

7

mailed them through the institutional mail to Warden Cruz, Assistant Warden Ivory, and Lieutenant Leap. *See id.* at 112-13, 116. Plaintiff also sent the BP-8 to Lieutenant Leap. *See id.* at 122-23; Ex. 9. Both Lieutenant Leap and Assistant Warden Ivory talked to Plaintiff separately about the affidavit sometime in December while he was still in the SHU, and both told Plaintiff that he would probably be transferred. *See* Tr. at 113-14.

Malcolm Lincoln, who was Plaintiff's cell mate in the SHU, testified that Warden Cruz refused to stop and talk to Plaintiff in the hallway and that she was telling the captain and other officers that she planned to transfer Plaintiff. *See id.* at 79-80, 82. Lincoln was aware that Plaintiff had asked for forms, including a BP-9, and that they had not been provided to him. *See id.* at 86-87, 91. According to Lincoln, when inmates are in the SHU, counselors do not want to give them administrative forms. *See id.* at 88. Lincoln testified that he advised Plaintiff that, since he was in the SHU, he had the right to seek emergency relief and to file a BP-8 and then a BP-10, without filing a BP-9. *See id.* at 86-87.

Plaintiff testified that he asked Counselor Lisa Jordan, who was not his counselor, for a BP-10 form when she was making rounds in the SHU and that she gave him one. *See id.* at 115, 130. He did not ask Counselor Jordan for a BP-9 because he thought he had done everything necessary for a BP-9 when he notified Warden Cruz, as well as Assistant Warden Ivory and Lieutenant Leap, about the incident, because the purpose of a BP-9 is to put the warden on notice. *See id.* at 115-16, 131. Counselor Jordan testified that she did not provide to Plaintiff the BP-10 form that

8

Plaintiff filed because the form does not have her initials on it. *See id.* at 141; Ex. 11. However, she does remember talking to Plaintiff in the SHU, but she does not remember what they talked about or if he asked her for a form. *See* Tr. at 143-44. Nevertheless, Plaintiff filed two BP-10s – one concerning the incident and one concerning medical care. *See id.* at 24-25, 125, 133; Ex. 10 & 11. Plaintiff explained that he filed a BP-10 because he never received a BP-9 form. *See* Tr. at 115.

Plaintiff testified that Warden Cruz met with him in the SHU sometime in January to obtain his signature to release information concerning a congressional inquiry about the incident, which inquiry had been initiated by Plaintiff's mother. *See id.* at 117-18; *see also id.* at 68-71; Ex. 16 (Congressional Inquiry); Ex. 17 (Release of Information Consent). The typewritten affidavit included with the congressional inquiry contains allegations that Plaintiff was attempting to pursue his administrative remedies but was being thwarted by Warden Cruz and other officers. *See* Tr. at 109; Ex. 16. Lieutenant Leap also was present at the meeting. *See* Tr. at 71, 118. Plaintiff asked Warden Cruz why she had not responded to his affidavit, and she told him that she did not allow people who fight officers to stay in her facility. *See id.* at 118. She asked Lieutenant Leap to leave the room, and she then gave Plaintiff an opportunity to explain his side of the situation and specifically asked if he desired to stay at FCI Seagoville. *See id.* at 118. Plaintiff told her that he wanted to stay because he was attending college classes, his family lived nearby and visited him at least three times a week, he was trying to keep his marriage, and his son had gotten into some trouble and he wanted to maintain the father-son relationship. *See id.* at 95, 118. Warden Cruz

9

responded that she would let him stay at FCI Seagoville, but, "if I hear anything else about this situation, you're out of here." *Id.* at 119. Plaintiff understood that to mean that, if he filed any more paperwork concerning the incident, he would be transferred. *See id.* at 119-21. Plaintiff believed that Warden Cruz had authority to transfer him, and he did not file any more paperwork concerning his administrative remedy. *See id.* at 120. Plaintiff's cell mate, Lincoln, testified that Plaintiff told him that Warden Cruz agreed to let him stay at FCI Seagoville because she understood the situation with his young son. *See id.* at 81-82, 84, 90-91.

Warden Cruz testified that she did not make an agreement with Plaintiff that, if he would not pursue an administrative remedy request concerning the incident, she would not transfer him to another facility. *See id.* at 41. She testified that she did make an agreement with him that, if he stayed out of trouble, she would not put in for a transfer to a higher security institution. *See id.* at 41-42. Warden Cruz could request a transfer, but she did not have final decision-making authority concerning transfers. *See id.* at 41-42, 48-49. Warden Cruz explained that keeping family ties intact has a positive impact on recidivism and helps the inmate transition more safely into the community. She knew that Plaintiff had a child at risk in the community with whom he was trying to maintain a relationship, that he had regular visits from his family, and that it would be in the child's best interest to have his father nearby. *See id.* at 42-43, 57-58. Even though Plaintiff was eligible for medium security confinement after the incident, Warden Cruz requested management variables for lesser security to keep him at FCI Seagoville. *See id.* at 45-47; Ex. 13 (Request for Transfer/Application of

Management Variable).

Warden Cruz testified that, after Plaintiff agreed to conduct himself appropriately, he was released from the SHU and returned to the compound at FCI Seagoville. *See* Tr. at 53, 74. Plaintiff sent a handwritten note dated August 17, 2010 to Warden Cruz that stated in part: "I know I gave you my word before that I would stay clear of trouble, and believe me I did in doing everything I could to keep my word." *Id.* at 53, 55, 129-30; Ex. 14. According to Warden Cruz, this note confirms their prior agreement. *See* Tr. at 55-56.

Counselor Guzman testified that Plaintiff was the only inmate of whom he was aware in his eighteen years with the Bureau of Prisons who was not shipped out to another facility after allegedly assaulting an officer and that he was surprised that, when Plaintiff got out of the SHU, he was returned to the general population instead of being transferred to another prison. *See id.* at 33. Lincoln was also surprised at Warden Cruz's "change of heart" because normally an inmate in Plaintiff's position would be transferred. *Id.* at 83.

Both of the BP-10s that Plaintiff filed were rejected because they did not meet all the criteria for a sensitive administrative remedy. *See id.* at 24-25, 125, 133; Ex. 10 & 11 (BP-10s and Rejection Notices). The rejection notices were dated January 13, 2010 and January 26, 2010, and both dates were after the meeting between Plaintiff and Warden Cruz. *See* Tr. at 134; Ex. 10, 11. Plaintiff did not appeal the rejection of the BP-10s or file a BP-11. *See* Tr. at 125.

## Analysis

Defendants assert that Plaintiff failed to exhaust his administrative remedies because he did not file either a BP-9 or BP-11. Plaintiff does not dispute that he failed to file a BP-9 and to follow up after his BP-10s were rejected and file a BP-11, but he claims those remedies were unavailable to him because prison officials failed to provide him with the necessary forms and later threatened to retaliate against him if he continued to pursue his administrative remedies. Thus, Plaintiff argues that he exhausted all "available" administrative remedies.

It is undisputed that BP-9 forms, which are the inmate's key to courthouse, are secured in the SHU and access to them is controlled by a counselor. Plaintiff and Counselor Guzman disagree as to whether Plaintiff requested a BP-9 form. The evidence shows, however, that Plaintiff was quite prolific in preparing, filing, and distributing handwritten affidavits and other documents to the warden and other officials both within and outside the prison system.

However, based on all the evidence, the undersigned concludes that Defendants must prevail on their affirmative defense even if the undersigned were to find credible Plaintiff's testimony that he requested a BP-9 form from Counselor Guzman – whom Plaintiff and Counselor Guzman both believed at the time to be Plaintiff's counselor with responsibility for giving Plaintiff such a form – and did not receive one. That is because Plaintiff's asking Counselor Guzman for a BP-9 and not receiving the requested form does not end the analysis based on all the facts and circumstances in this record.

12

Critically, Plaintiff knew that he needed to obtain and submit a BP-9, and, while Counselor Jordan does not recall the conversation, Plaintiff testified that he only asked Counselor Jordan for a BP-10, at a time when he had not yet obtained and submitted a BP-9. Plaintiff explained why he sought to file a BP-10 after failing to obtain a BP-9 from Counselor Guzman: "I never got a BP-9, so I figured, you know, I need – I need to be moving forward with this, because I know there is a necessity for the administrative remedy. So I filed a 10." Tr. at 115. Plaintiff further explained at the hearing that he did not ask Counselor Jordan for a BP-9 because he thought he had done everything necessary in connection with the BP-9 requirement when he notified Warden Cruz, as well as Assistant Warden Ivory and Lieutenant Leap, about the incident, because the purpose of a BP-9 is to put the warden on notice. *See id.* at 115-16, 131.

But that will not suffice to satisfy the PLRA's exhaustion requirement. The United States Supreme Court has "held that to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules – rules that are defined not by the PLRA, but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to properly exhaust." *Jones*, 549 U.S. at 218 (internal quotation marks and citations omitted). But the exhaustion requirement requires "proper exhaustion," meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v.*

*Ngo*, 548 U.S. 81, 88 (2006). Accordingly, "mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, [the Fifth Circuit has] required prisoners to exhaust available remedies properly." *Dillon*, 596 F.3d at 268.

Faced with this authority, Plaintiff's counsel argued that Plaintiff understood that he needed to file a BP-8, then a BP-9, then a BP-10 and that Plaintiff tried to file a BP-9 and only did not do so because he could not get such a form. But, based on his own testimony, Plaintiff could have asked Counselor Jordan for a BP-9 and may have obtained one, as he, according to his own testimony, did obtain a BP-10 from Counselor Jordan upon request. And the testimony established that an inmate could have properly requested a BP-9 from another counselor – who could provide him with such a form, whether on his or her own or after checking with the inmate's assigned counselor. *See* Tr. at 32-34, 72-73; *see also id.* at 102-03. But it is undisputed that he did not ask Jordan for a BP-9 at the time that he asked her for a BP-10 – even though he had not filed a BP-9 and knew that filing such a form was a required part of the process. *See id.* at 115-16, 128-31.

Under the circumstances of this case, and based on all of the evidence presented, the undersigned finds that Plaintiff did not comply with all the administrative requirements by filing a BP-9 and therefore failed to properly exhaust the administrative remedies that were available to him. Accordingly, Plaintiff's case should be dismissed with prejudice because Plaintiff's failure to properly exhaust administrative remedies cannot, at this time, be cured.

In light of these findings and conclusions, the Court need not address the follow-on issue of whether, as to the BP-11 requirement, the required remedies were unavailable to Plaintiff because he believed that prison officials had threatened to retaliate against him if he continued to pursue his administrative remedies.

## Recommendation

The undersigned finds that Defendants have proved that they are entitled to the affirmative defense of exhaustion of administrative remedies – that is, Defendants have proved that Plaintiff failed to properly exhaust the administrative remedies that were available to him – and therefore recommends that Defendants' PLRA exhaustion defense be sustained and Plaintiff's case be dismissed with prejudice.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v.*

*United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

    DATED: October 31, 2013

                                                          DAVID L. HORAN
                                                          UNITED STATES MAGISTRATE JUDGE